In re NATIONAL LIQUIDATORS, INC., Debtor.

Thomas R. Noland, Chapter 11 Trustee, Plaintiff,

v.

Carl Morefield, et al., Defendants.

Bankruptcy No. 93–56266.

Adversary No. 95–557.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Dec. 7, 1998.

Robert E. Bardwell, Jr., Columbus, OH, for Defendants.

Robert B. Berner, Dayton, OH, for Plaintiff.

Alexander G. Barkan, Columbus, OH, Assistant United States Trustee.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CHARLES M. CALDWELL, Bankruptcy Judge.

This matter is before the Court upon the motion of the chapter 11 trustee ("Trustee") for partial summary judgment. The Trustee seeks to avoid fraudulent transfers and preferential transfers made by the Debtor, National Liquidators, Inc. ("NLI") to the Defendants, Parma and Carl Morefield, in a "ponzi" scheme. The Trustee asserts that approximately $371,650 is avoidable under theories of: (1) actual fraud pursuant to 11 U.S.C. § 548(a)(1) and O.R.C. § 1336.04(A)(1); (2) constructive fraud pursuant to 11 U.S.C. § 548(a)(2) and O.R.C. § 1336.04(A)(2); and (3) 90–day preferences pursuant to 11 U.S.C. § 547(b).

Vance K. Wolfe ("Wolfe") was president of NLI and operated National Liquidators ("NL"), which was affiliated with and a predecessor in interest to NLI. In 1990, Wolfe and/or NL and/or NLI solicited money for investment and reinvestment from investors, promising a high rate of return and on this basis perpetrated a "ponzi" scheme. The Defendants participated in the "ponzi" scheme by investing money with Wolfe, NL, and/or NLI, and accepting money from them as a return on their initial investment.

On October 3, 1993, an involuntary petition for relief under title 11 of the United States Code was filed against NLI. The Court entered an Order for Relief with the consent of NLI on October 25, 1993. On September 28, 1995, the Trustee filed a Complaint based upon avoidable transfers paid by NLI to the Defendants totaling $606,250.[1] There were eight transfers that occurred between January 7, 1992, and August 20, 1993:

| | |
|---|---|
| 1–7–92 | Payment of $8,000 to Parma Morefield |
| 10–15–92 | Payment of $34,200 to Parma or Carl Morefield |
| 11–12–92 | Payment of $17,300 to Parma or Carl Morefield |
| 12–16–92 | Payment of $14,000 to Parma or Carl Morefield |
| 3–10–93 | Payment of $158,500 to Parma Morefield |
| 6–18–93 | Payment of $200,000 to Parma Morefield |
| 7–14–93 | Payment of $19,250 to Parma or Carl Morefield |
| 8–20–93 | Payment of $150,000 to Parma or Carl Morefield |

Parma Morefield endorsed seven of the checks received from NLI totaling $582,000, while Carl Morefield endorsed one of the checks for $19,250. It is against the factual background that the Court will analyze the Trustee's pending motion for partial summary judgment, as well as the Defendants' memorandum in opposition.

The Court finds that the Debtor perpetrated a "ponzi" scheme, where the returns paid to investors were obtained from money solicited and received from new investors rather than from an underlying legitimate business venture. *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D.Ohio 1993). The affidavit of Alan D. Lasko, CPA, the estate's accountant, provided in pertinent part:

> NLI was engaged in a fraudulent 'ponzi' scheme promising high rates of return from at least September 1, 1991, and continuously thereafter ... During this time, there was not sufficient assets or profits from NLI's business activities to repay amounts due NLI's investors.

> NLI primarily maintained one bank account where substantially all of the investor receipts and disbursements, as well as other transactions, took place. Investor funds were commingled in that account and were used to pay returns to other investors.

Lasko, as a CPA specializing for 12 years in bankruptcy-related accounting including, but not limited to fraudulent investment schemes, reviewed the financial records of NLI in order to make an informed and expert opinion. The Defen-

---

1. The transfers actually equal $601,250.

dants offer no proof that otherwise shows that the Debtor was not engaged in a "ponzi" scheme, nor do the Defendants challenge the validity of Lasko's affidavit or submit their own affidavit that would counter Lasko's affidavit.

There is no dispute that transfers were made to the Defendants. However, the Defendants assert in their memorandum in opposition to the motion for partial summary judgment that Carl Morefield only endorsed the check dated July 14, 1993, for $19,250 and therefore, is not liable for the rest of the transfers. In the Trustee's reply to the Defendants' motion, the Trustee recognizes that Carl Morefield may have endorsed only one of the checks; however, as noted by the Trustee, that possibility would not preclude the granting of partial judgment against each for different amounts.

■ In order for the Trustee to avoid transfers for false profits (amounts received by the Defendants that are in excess of the Defendants' original investments),[2] the Trustee had to show that the transfers were actually fraudulent, pursuant to 11 U.S.C. § 548(a)(1) or the Ohio Uniform Fraudulent Transfer Act[3] at O.R.C. § 1336.04(A)(1). According to 11 U.S.C. § 548(a)(1), the Trustee was required to demonstrate that: (1) there was a transfer of interest of the Debtor in property; (2) the transfer occurred on or within one year before the date of filing of the bankruptcy; and (3) the transfer was made with actual intent to hinder, delay, or defraud.

■ First, payments made to investors in a "ponzi" scheme constitute trans-

fers of interest of a debtor in property. *Taubman,* 160 B.R. at 982–83. It has already been established that the Debtor was the perpetrator of a "ponzi" scheme, and the Trustee has introduced copies of checks of actual payments made by NLI to the Defendants totaling $601,250.

Second, the copies of the checks representing the actual transfers made by NLI to the Defendants establish that all but one transfer occurred within one year of the petition date of October 13, 1993. Only the check dated January 7, 1992, for $8,000 was transferred more than one year before the bankruptcy was filed. The rest of the transfers occurred within one year of the bankruptcy.

Finally, the Trustee has shown that the Debtor made the transfers with actual intent to hinder, delay, or defraud. In granting the Trustee's motion for partial summary judgment, the *Taubman* court noted that a debtor "must know all along, from the very nature of the business of his activities, that investors will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud him." *Taubman,* 160 B.R. at 983, *citing In re Independent Clearing House Co.,* 77 B.R. 843, 860 (D.Utah 1987).

■ As further support for his motion for partial summary judgment, the Trustee contended that the $8,000 that was not avoidable under 11 U.S.C. § 548(a)(1), *is* avoidable under O.R.C. § 1336.04(A)(1).[4] Aside from the requirement that there must be a transfer with actual intent to

---

**2.** In order to determine the amount of the Defendants' false profits, the total amount invested by the Defendants ($229,600) should be subtracted from the total amount paid by the Debtor to the Defendants ($601,250), resulting in total false profits of $371,650.

**3.** The Ohio Uniform Fraudulent Transfer Act replaced the Ohio Uniform Fraudulent Conveyance Act in September 1990. Therefore, UFTA applies to the transfers in the instant

matter because they occurred after 1990. UFCA was applied in *Taubman* because the transfers occurred prior to the filing of the bankruptcy in 1989. The two acts, however, contain the same provisions at issue in this matter.

**4.** 11 U.S.C. § 544(b) allows a trustee to invoke state law in order to avoid any transfer of interest of the debtor in property.

hinder, delay or defraud, the latter statute does not provide that the transfer to be avoided must occur within one year of the bankruptcy. Thus, the Court finds false profits in the amount of $371,650 avoidable pursuant to 11 U.S.C. § 548(a)(1) and O.R.C. § 1336.04(A)(1) under a theory of actual fraud.[5]

▮▮▮▮ In the alternative, the Trustee seeks to avoid false profits under a constructive fraud theory pursuant to 11 U.S.C. § 548(a)(2).[6] Once again, there must have been a transfer of an interest of a debtor in property that was made on or within one year before the petition date. Additionally, a debtor must have voluntarily or involuntarily:

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(2).

The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the "ponzi" scheme. In a bankruptcy case, "the provisions of the Investment Agreement are unenforceable to the extent they propose to require payments to the defendants in excess of a defendant's principal investment or loan." *Taubman,* 160 B.R. at 985, *citing Independent Clearing House,* 77 B.R. at 858. While there is no mention of an investment agreement, there are cash receipts that show the Defendants were to receive more than triple the amount they invested.

Additionally, the Trustee has demonstrated that NLI was insolvent, operating with unreasonably insufficient capital, and incurring debts beyond its ability to pay. The Lasko affidavit states, "NLI was insolvent from at least September 1, 1991 and continuously thereafter, based upon a balance sheet test." The *Taubman* court noted that "insolvency constitutes unreasonably small capital *per se.*" *Taubman,* 160 B.R. at 986. While the Debtor's intent to incur debts that were beyond its ability to pay is not known specifically, it can be inferred "as a result of the debtor's continuous insolvency and operation of a ponzi scheme." *Id.* at 987. Moreover, the Lasko affidavit states that during the Debtor's operation of the "ponzi" scheme, "there were not sufficient assets or profits from NLI's business activities to repay amounts due NLI's investors."

Defendants' affirmative defense pursuant to 11 U.S.C. § 548(c),[7] which states that the transferee of fraudulent transfers may retain the transfers if the transferee can establish both "value" and "good faith," fails. The *Taubman* court held that "to the extent that the Trustee seeks to

---

5. The Trustee has chosen not to seek recovery of the total amount transferred to the Defendants. He is only seeking avoidance of the amount found to constitute the Defendants' false profits. Therefore, the amount that the Defendants invested, $229,600, has been subtracted.

6. Analysis of O.R.C. § 1336.04(A)(2) and § 1336.05(A) is not needed because each contains the same requirements as 11 U.S.C. § 548(a)(2). However, like O.R.C.

§ 1336.04(A)(1), there is no requirement that the transfer occur within a year of the bankruptcy. Therefore, the transfer of $8,000 should be avoided as well.

7. Defenses under O.R.C. § 1336.04(A)(1) fail for the same reasons that § 548(c) fails. Defenses under O.R.C. § 1336.04(A)(2) and § 1336.05(A) do not apply to any issues in this case.

avoid false profits, § 548(c) does not provide a defense for any defendant." *Taubman,* 160 B.R. at 987. What investors in a "ponzi" scheme give the perpetrator of the scheme in exchange for transfers in excess of their investment is not "value" within the meaning of § 548. *Id.* Thus, in the alternative to recovery based on actual fraud, the Court finds that the total of $371,650 is avoidable pursuant to 11 U.S.C. § 548(a)(2) and O.R.C. § 1336.04(A)(2) under the theory of constructive fraud.

▇▇▇ The Trustee also moved for partial summary judgment under the theory that two of the transfers were 90-day preferences, and thus should be avoided. In order to prevail, the Trustee was required to establish as a matter of law all of the following elements: (1) a transfer of interest of the Debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the Debtor before such transfer was made; (4) made while the Debtor was insolvent; (5) made within 90 days of the bankruptcy; (6) which enables the creditor to receive more than the creditor would have received in a chapter 7. 11 U.S.C. § 547(b).

It is undisputed that the checks dated July 14, 1993, and August 20, 1993, for $19,250 and $150,000, respectively, were made within 90 days of the date of filing of the petition for relief, on October 13, 1993. The Trustee also has established that the checks from NLI to the Defendants were transfers of interest of the Debtor in property, and that the NLI was insolvent at the time.[8] The transfers were to or for the benefit of a creditor because the Defendants admitted paragraph 20 of the Trustee's Complaint that "the Defendants are and were prepetition creditors of NLI."

The Trustee established that the transfers occurred on account of an antecedent debt owed by the Debtor before the transfers were made. An antecedent debt is a

debt that is incurred before the transfer. *In re AOV Industries, Inc.,* 85 B.R. 183, 185 (Bankr.D.Colo.1988). In his motion for partial summary judgment, the Trustee outlined the investments that included transfers made within 90 days of the bankruptcy by the Defendants to NLI. As support for this proposition, the Trustee attached cash receipts from NLI that recorded each relevant investment and the prospective return on each investment. Summarizing the undisputed evidence, NLI owed $269,250 to the Defendants by July 14, 1993, and $150,000 to the Defendants by August 13, 1993. NLI transferred $19,250 on July 14, 1993, and $150,000 on August 20, 1993, after the debt was incurred.

Finally, the Trustee demonstrated that the Defendants received more from the transfers than they would have in a chapter 7 liquidation. *See In re Chattanooga Wholesale Antiques, Inc.,* 930 F.2d 458 (6th Cir.1991) (noting that an unsecured creditor who receives payment during the preference period is in a position to receive more than it would have received in a chapter 7 liquidation). Once again, the Defendants did not dispute Lasko's statements in his affidavit that "the liquidation value of NLI's assets at all times relevant was insufficient to provide a 100% distribution to creditors if the case had been commenced under Chapter 7." Thus, the Court concludes that the Defendants received more than they would have in a chapter 7.

▇▇▇ Like the defenses to avoiding false profits, the defenses asserted by the Defendants as to the Trustee's claim that preferential transfers were made fail. *Answer of Defendants, paragraph 6.* 11 U.S.C. § 547(c) sets forth the available affirmative defenses to preferential transfers. However, the only relevant defenses, § 547(c)(2) and § 547(c)(4), do not apply here. 11 U.S.C. § 547(c)(2) provides that if a debtor was paid in the ordinary course

---

8. The Debtor is presumed to have been insolvent on and during the 90 days immediately

preceding the date of the filing of the petition. 11 U.S.C. § 547(f).

of business, then the transfer cannot be avoided. "Ponzi" schemes are not legitimate businesses which Congress intended to protect by enactment of § 547(c)(2). *Taubman,* 160 B.R. at 991, *citing Henderson v. Buchanan,* 985 F.2d 1021, 1025 (9th Cir.1993). Similarly, because Defendants are investors and not trade vendors, there is no question that § 547(c)(2) is not allowed as a defense. *See In re Hedged–Investments Associates, Inc.,* 48 F.3d 470 (10th Cir.1995). Section 547(c)(4), a possible defense if the transferee provided new value after the avoidable transfer, fails because the Defendants did not provide any new value after the two preferential transfers.

Defendants also asserted affirmative defenses under 11 U.S.C. §§ 550 and 553 in their answer. However, each of these defenses fails. There is no defense under § 550 that will succeed, and the Defendants do not argue this defense in their memorandum in opposition to the motion for partial summary judgment. Similarly, the defense under § 553 fails because the right of setoff may not be exercised by a creditor to the extent that the creditor has acquired the claim as a preferential transfer. 11 U.S.C. § 553(b)(1). Additionally, § 553 does not apply in this instance because the Debtor and the investors are not mutually indebted, and therefore, the debts may not be set off against each other.

Consequently, the Trustee's motion for partial summary judgment should be granted as to the avoidance of preferential transfers of $169,250 in addition to prejudgment interest on the preferential payments from the date the Complaint was filed, September 28, 1995. *See In re Foreman Industries, Inc.,* 59 B.R. 145 (Bankr. S.D.Ohio 1986) (noting that the majority of courts have awarded prejudgment interest in preference actions).

The Court concludes that no genuine issue of material fact exists and the Trustee is entitled to partial summary judgment.

Accordingly, the Court hereby **GRANTS** the Trustee's motion for partial summary judgment against Parma Morefield for $352,400 and against Carl Morefield for $19,250.

**IT IS SO ORDERED.**